IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(Kansas City Docket)



| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br><br>CHUNQUI WU<br>a/k/a Kelly<br><br>Defendant. | Case No. 19-mj-8273 TJJ |

## CRIMINAL COMPLAINT

I, Jarrod Forgues Schlenker, being duly sworn state the following is true and correct to the best of my knowledge and belief.

### COUNT 1

On or about November 14, 2019, in the District of Kansas and elsewhere, the defendant,

**CHUNQUI WU**
**a/k/a KELLY,**

knowingly attempted to transport an individual in interstate commerce for the purpose of engaging in prostitution, and in sexual activity for which any person could be charged with a criminal offense, namely Kansas Statute Annotated § 21-6420 (Promoting Prostitution), in violation of Title 18 United States Code, Sections 2421(a).

## AFFIDAVIT

I, Jarrod Forgues Schlenker, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since September 2018. Since April 2019, I have been assigned to investigate civil rights violations including human trafficking and hate crimes. I have been involved in the execution of search warrants to search residences and seize digital evidence including, but not limited to, computers, cell phones, and other related electronic storage devices. I have interviewed individuals who have worked in the commercial sex industry and worked closely with other law enforcement officers who have investigated commercial sex related violations for many years. The following is based on my own investigation and reports made to me by other law enforcement officers.

2.  I make this affidavit in support of a complaint and arrest warrant application for **Chunqiu Wu**, also known as (aka) Kelly, for attempting to transport an individual in interstate commerce with the intent that the individual engage in prostitution, or in any sexual activity for which the person can be charged with a criminal offense, in violation of 18 U.S.C. § 2421(a).

3.  The facts in this affidavit come from my personal observations, training and experience, and information obtained from other agents, officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### PROBABLE CAUSE

4.  In October 2018, the Olathe Police Department (Olathe PD) performed a compliance check at Alpha Massage (Alpha), previously known as Relaxation Station, located at 116 S. Clairborne, #A in Olathe, Kansas, to ensure the business was abiding by mandatory

2

licensure requirements. Following this check, the Olathe PD began investigating Alpha and other related Asian massage parlors (AMPs). Their investigation lead to the identification of **Chunqiu Wu**, aka Kelly, as being involved in the ownership and operation of multiple AMPs, to include: Alpha; A Plus Massage (A Plus), formerly known as Magical Massage, located at 527 N. Mur-Len Road, in Olathe, Kansas; and King Spa located at 13014 State Line Road, in Leawood, Kansas. Through title documents Olathe PD confirmed that **Wu** owns two houses in Johnson County, Kansas. Surveillance, massage license applications, and communications between **Wu** and a Confidential Human Source (Source) (discussed more fully below), confirmed that, therapists from Alpha, A Plus, and King Spa reside at one of the houses owned by **Wu**. Surveillance of **Wu**, these three massage parlors, and the residences, showed **Wu** transporting therapists back and forth between the residences and parlors.

2. Based on training and experience, the Affiant knows patrons of AMPs often use websites such as Eccie.net and Rubmaps.ch to write reviews of their experiences at various parlors. These reviews may include descriptions of the sexual services provided, prices, caliber of massage, and general observations about patrons' experience. A search on Rubmaps showed 54 reviews for Relaxation Station located at 116 S. Clairborne, #A in Olathe, Kansas, the same address as Alpha, which has been known as Alpha, since at least 2017; 30 reviews for Magical Massage located at 527 N. Mur-Len Rd., #A, Olathe, Kansas 66062, the same address as A Plus, which has been known as A Plus since at least 2016; and six reviews for King Spa located at 13014 State Line Rd., Leawood, Kansas 66209.[1] Eccie.net had a review of Magical Massage (A

---

1. Relaxation Station and Magical Massage are the respective previous names for Alpha and A Plus. Though the review websites list the old business names, the addresses are consistent with those for Alpha and A Plus and the reviews themselves reference the current names of the parlors and parlor websites. It is unknown the exact date when the names changed.

Plus), as recently as October 8, 2019, and discussed the patron's experience receiving a hand job[2] and groping the therapist. Other reviews from 2019 for all three parlors discuss similar experiences in which patrons receive sexual favors in exchange for additional tips. On the establishment owner license for A Plus, **Wu** was listed as the owner from 2016 to 2018, and her fiancé assumed ownership in 2019. Going back to at least 2017, **Wu** paid rent and utilities for King Spa and Alpha.

3. In the course of the investigation, the Source, someone with knowledge and understanding of the illicit massage parlor industry, contacted **Wu** on August 21, 2019, and inquired about the possibility of employment at one of **Wu's** parlors. The Source told **Wu** she had a friend, whose friend used to work for **Wu**, and recommended the Source reach out to **Wu** for employment. All phone conversations and text messages between the Source and **Wu**, were recorded, translated, and reviewed by the Affiant for accuracy and consistency with what the Source reported. During their first conversation, after the introduction, **Wu** states, "I see, you want to come to work here, right?" **Wu** told the Source, "I have two parlors. Three parlors in total," and then specifically named King Spa, Alpha, and A Plus as parlors owned or run by **Wu**. **Wu** then told the Source, "True, my parlor is doing pretty well, doing pretty well in Kansas, but to be honest, it is not as good as it was in the past, because so many businesses have run into trouble under the current climate. I don't do advertisements. The adult advertising they do is too messy. I'm a very conservative person. I don't do massage myself. I don't advertise. So, if you, you [sic] don't have high expectations, then that's fine." She then went on to say "because over here we, uh, you know they do [that], it just can't be too excessive…. In other words, I can't tell you my thoughts over the phone, but if she (meaning the friend of the Source) has worked here

---

[2] Consistent with K.S.A § 21-6419's definition of sexual relations, "manual or other bodily contact stimulation of the genitals of any person with the intent to arouse or gratify the sexual desires of the offender or another."

4

before, then she should know how we work here, but I can't let it be out of control." **Wu** went on to say, "But of course, I also know that they want to, uh, make some money, but, I just can't go above and beyond. Does that make sense?"

4. In subsequent calls between September 5, 2019, and September 13, 2019, the Source told **Wu** that she worked in California, where she and other therapists "do all kinds of work: hand jobs, add-on services… We do it all." To which **Wu** initially responded "No, no, no, no, no. Absolutely not." **Wu** then went on to say "I cannot tell you over the phone that we do hand jobs or add-on services here. No! I, I [sic] don't approve. I won't talk to you about this. Why? I'm also liable. I'm the boss…. I'll just tell you, the work we do here cannot be too excessive." **Wu** then elaborated further and said "We have massage rules, and our additional services can't be too obvious. Right? I don't do adult advertisements. 85% of my customers are returning customers. If you want to earn a lot of money, then I can't promise that. Why? We've lost a lot of clients who experience over-the-top services at other places since we can't meet their requirements." Based on my training and experience "over-the-top" services within the context of the conversation between **Wu** and the Source refers to sexual intercourse.

5. During the recorded calls, the Source and **Wu** discussed other aspects of **Wu's** parlors and work there to include advertising, the quality of the massages, the number of potential customers, and how much money the Source could make as a massage therapist and a co-owner. Some of these conversations referenced online parlor reviews. **Wu** first mentioned online reviews, saying "I look at the reviews, and if they're really, really bad, or if less than half are good, I'll be concerned. I am concerned when the tips are too high. Generally, the clients I have here know the rules and give tips accordingly." The Source then told **Wu** "I want to go

check out the reviews, etc. Because, if it's not convenient for you to talk about[3], then you don't know what the masseuses are up to. I know you mentioned reviews are written on [unintelligible]. Can you tell me the name of the parlor?" After providing the names of the parlors, **Wu** asked the Source to look at the reviews and tell her "if there's a situation when you're done checking it out, okay? And then write… If customers or our employees have written anything bad, you let me know. I won't say you're the one who told me." In the following conversation with **Wu** about the reviews, the Source reported: "Since I read about the first two parlors…. It was all about hand jobs, add-on services, just simple things like that. And some returning customers… I think customers, when they return, if you provide good work, good service, and good massage, then customers will keep coming back." To which **Wu** responded, "I can tell you that 85% are old customers," and then went on to say she does not advertise.

6.       Also during the course of their conversations, **Wu** proposed that for $20,000 the Source could partner with **Wu** in running one of her parlors and in the interim agreed to provide the Source a job at her parlor located in Leawood. **Wu** also informed the Source that she would provide housing to the Source for $10 per day paid to **Wu's** daughter. **Wu** agreed to pick up the Source from the airport and advised the Source that she always picks up all her employees from the airport. The Source sent **Wu** her flight information from LAX to MCI, and again confirmed that **Wu** would pick up the Source at the airport and transport her to Kansas where **Wu** would provide lodging and employment at her parlor.

---

3 Referring to Wu not wanting to discuss over the phone, the sex acts performed at the parlors.

7. Olathe PD and the Leawood Police Department (Leawood PD) both performed undercover operations at **Wu's** massage parlors.

    a. On August 21, 2019, an undercover Olathe PD officer (Olathe UC) visited Alpha and requested a half hour massage. During the massage the therapist asked if Olathe UC wanted her to massage his penis. After UC#1 said yes, she began the requested massage and said it would cost $40. Olathe UC said he did not have enough cash, stopped the therapist, and left. While in Alpha, Olathe UC recognized the therapist and another employee from a previous compliance check he performed at A Plus.

    b. On March 19, 2019, a second undercover Leawood PD officer (Leawood UC#2) visited King Spa and requested an hour massage. During the massage, the therapist exposed and touched Leawood UC#2's genitals multiple times and massaged his pubic area.

8. As observed by Olathe UC, and confirmed through FBI and Olathe PD surveillance, it is common for therapists at one of **Wu's** establishments to also work at her other AMPs. A review of the license applications for therapists working at Alpha, A Plus, and King Spa, showed that according to license applications, six therapists listed **Wu** as assisting them with their applications for Alpha and A Plus, for a total of twelve applications. Seven therapists, in seven applications, listed **Wu** as the owner of A Plus, three therapists, in three applications, listed **Wu** as their supervisor at Alpha, and **two** therapists in four applications listed one of **Wu's** houses as their home address. All three parlors list **Wu** as the point of contact.

9. The FBI, Olathe PD, and Leawood PD performed surveillance of Alpha, A Plus and King Spa. Upon reviewing the surveillance activity, and based on my training and experience, the clientele and business activities of these parlors are consistent with AMP's engaged in commercial sex. The exterior of the parlors have blackened-out windows, temporary

7

signage, and stock photos, consistent with illicit activity. Additionally, during the second Leawood undercover operation, the Leawood UC#2 observed that a patron had written "Donald Duck" as his name in the login book. Inaccurate logbooks, and books containing fictitious names are indications of illegal activity within the parlors. The patrons observed frequenting these locations were all male customers who would arrive as late as 9:00 pm. The therapists would often get dropped off and picked up from the parlors by other Asian females. **Wu** was also observed at the various parlors during these surveillance activities, and according to tracker information on **Wu's** vehicle, she spent as much as two to three hours at a given parlor.

10. On November 13, 2019, **Wu** sent a text message to the Source asking for a photo of the Source's driver's license. **Wu stated** it was be needed to fill out the Source's application. **Wu** stated that **Wu** will have her daughter print out the photo and send it to the federal school and then have the school send the Source's grades to city hall to apply for the license. The Source tells **Wu,** that since she is arriving tomorrow (November 14, 2019), the Source will bring all the documents with her, and just give them to **Wu** when she arrives.

11. On November 14, 2019, at approximately 9:43 am, the Source sent a text message to **Wu** telling **Wu** the Source's United flight just landed at Kansas City International (KCI) Airport. The Source told **Wu** she was waiting for luggage and would be at gates 61-69. At approximately 9:55 am, **Wu**, accompanied by her fiancé, arrived at KCI terminal C, and parked just down from United gates 61-69.

12. In a post Miranda interview, **Wu** admitted knowing the therapists at her parlor engaged in sex acts with customers, specifically hand jobs. **Wu** also admitted to traveling to KCI to pick up the Source and transport her back to Kansas. **Wu** acknowledged the Source was coming to work for **Wu** at her Kansas massage parlor, and would also likely perform sex acts.

## CONCLUSION

13. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe **Wu** engaged in activity violating 18 U.S.C. § 2421(a), Attempted Transportation to Engage in Prostitution, by arriving at MCI with the expressed intent of transporting the Source from Missouri to Kansas in an effort to have the Source work at **Wu's** massage parlor and engage in prostitution, or sexual activity for which the any person could be charged with a criminal offense, namely K.S.A.§ 21-6420

Jarrod Forgues Schlenker
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me
This 14th day of November, 2019

HONORABLE TERESA J. JAMES
United States Magistrate Judge

Kim I. Flannigan, #13407
Assistant United States Attorney

9

**Penalties**

Count 1 - Travel with intent to engage in illicit sexual conduct, 18 U.S.C. §2423(b),

- NMT 30 years incarceration;
- $250,000 Fine;
- NLT 5 and NMT life SR; and
- $100.00 Special Assessment Fee